I understand that everyone is here. We will accordingly dispense with the calling of the calendar. We want to welcome Judge Kaplan, the Southern District of New York, who is joining us today. We're grateful for his assistance. We'll hear the first case, Congregation Rabbinical College v. Village of Pomona. May it please the Court, my name is Thomas Donlon, and with my colleague John Peloso, we represent all of the defendant appellants in this case. I request the Court to reserve two minutes for rebuttal. The briefs in this case address a large number of issues. I'd like to focus today on three of those issues. First, that the evidence did not prove discriminatory intent as to the 2001 and 2004 laws particularly. Two, that the proper standard for a facial challenge was not applied. And three, that the plaintiffs did not prove their challenge under RLUIPA. The District Court's conclusion that the 2001 and 2004 laws were enacted with religious discriminatory intent is clearly erroneous. There can be no discriminatory intent for a law that, when passed, allowed an Orthodox Jewish institution to build the very school that they initially proposed to the village. The 2001 law was enacted after Yeshiva Spring Valley, YSV, made their initial informal proposal. The changes in that law did not stop YSV from building the very primary and preschool it Notably, Tartikoff did not even exist in 2001. The 2001 changes included adding an accreditation requirement and a net lot area requirement based on the number of students. It continued prior existing zoning that did not allow dormitories. The argument is that the laws targeted an Orthodox Jewish facility. And even though that pre-existed, Tartikoff was the same religious animus. That's the argument. Your argument, I take it, is that there was no evidence of religious animus with respect to the previous applicant or potential applicant. That's correct. There's no evidence in the record at all as to a religious animus that brought about the enactment of the 2001 law. Is there any showing that following the 2001 law that the original applicant, or that the Yeshiva Spring Valley could not have built or gotten the unnecessary variances? To the contrary. Yeshiva Spring Valley made an application following the enactment of the 2001 law. That application was accepted, was under consideration, and it went through the circa environmental process until Yeshiva Spring Valley withdrew their application because they sold their property for a profit of $12 million. Prior to the 2001 law, the Pomona Village Ordinance at that time did not anticipate or didn't have any provisions with regard to educational institutions within the confines of the village. Is that correct? It had very limited requirements. It had a definition of a school, and it talked about a setback requirement. But it was determined- It was a permitted use. It was- Under the overall plan of the pre-2001. It was a use actually as of right. It did not require a special permit. The 2001 law changed it to make it a special permit, recognizing that educational uses in a residential zone have impacts. But the critical point is when YSV made its application after the law was passed, neither the accreditation requirement, that there was no evidence they didn't qualify for, the net lottery requirement calculations demonstrated they could have had up to 1,000 students and still complied. And they didn't ask for dormitories. In fact, Rabbi Frommelitz at the hearing, the initial hearing, said primary school children should live at home, not in dormitories. So when after the law is passed, YSV comes forward with their application, and they could build the very school they wanted to. And in fact, in 2004, the law was liberalized. The changes in the 2004 law only made it easier. It increased the types of agencies that could give accreditation. It eliminated the net lot area problem. And for the first time, it allowed dormitories, even though YSV was not asking for a dormitory. Other orthodox and acidic yeshivas in Rockland County were building dormitories. This change would allow it. The district court did identify some statements, specifically referencing the orthodox Hasidic Jews, the Hasidic community. Now, these statements were made after the accreditation law was first adopted, but before it was amended. So why isn't that some evidence of religious- Well, first, there are no statements that before the 2001 law. The only references the district court makes are the statements that, in fact, were made by consultants who drafted a law that allowed YSV to be built. So those statements can't be considered discriminatory. And the statements by the consultants manifested at least no overt animus. So they said, you need school zoning. You should update your school zoning like any planner might do, right? That's correct, your honor. And in fact, there was no indication of any animus on the part of the consultants. And nothing in the memos they wrote had any discussion of religious activities. As to the 2004 law, the Rabbi Fromowitz testified that he was aware of no commentary that was anti-Semitic during the process of his application. The 2004, the only evidence that the court referred to was other activities of the village opposing the adult student housing law in Ramapo. We're about to run out of time. I'll let you have a couple more minutes, but why don't you take on the legal question, your point two, I think. Certainly, your honor. Briefly, the Salerno standard is the standard to be applied in this matter. The district court's attempt to avoid that standard by relying on lukumi, which is a limited exception, as this court recognized in Central Rabbinical College, that only applies where laws were written to stop a particular religious activity. Here, as we've just discussed, the 2001 law wasn't written to stop YSV, it could still build it. So lukumi should not be applied in this case. This case was a general law applied to sectarian and non-sectarian schools. Under Salerno, the fact that YSV could build its school demonstrates that it was constitutional applied to that and would have been constitutional applied to many others. If I could- But if the district court was right with respect to the two later amendments, or to put it more appropriately, if the district court was not clearly erroneous with respect to the motivation for the two later amendments, then aren't we really out of the question of facial challenge? Don't we under Heckler look at this from an equal protection point of view and conclude that if this group, the Tartikoff group, was singled out on the basis of religion for different treatment, then that's the end of it. Isn't that right? First, if this court were to find as it should that the first two laws are constitutional, the district court's decision below cannot be upheld. Why not? Because the constitutional laws that were not passed with religious animus would preclude Tartikoff from building the rabbinical college that it's proposed. And therefore, there is no religious animus in the laws that would have the result of uphold of stopping them from building the rabbinical college. The two- Your point is that local law five of 2004 defined dormitory in such a way as to have prohibited the dorm rooms or accommodations with separate cooking. And that would have been the end of Tartikoff anyway. That's correct, as would the accreditation requirement. If I could briefly just mention the issue of the relupa. In this case, this court in Chabad-Lubavitch pointed out that reasonable expectation is a critical point. And when it was remanded to the court, pointed to that as a criteria that the district court had to address. The district court here found that Tartikoff had no reasonable expectation, but created its own exception for discriminatory conduct. However, this court in Chabad-Lubavitch pointed out, quoting the language from Bethel World Ministries in the Fourth Circuit, that there is a separate non-discrimination clause in relupa. And it would render it superfluous to read that into the substantial burden. So therefore, since there was no reasonable expectation, there was no substantial burden in this case, and the relupa challenge should fail. Thank you. We'll hear from the other side. You've reserved some time for rebuttal. Thank you. Good morning. May it please the court. Roman Storza for the plaintiffs, appellees, cross-appellants. Because we have a cross-appeal, I'd request that we reserve one minute for rebuttal. All right. Thank you. Your Honors, what the village is doing here is they're basically asking for a do-over. They're asking the court to look at specific pieces of evidence that they believe they have some argument toward. And they ignore the hundreds of other pieces of evidence that the district court- Tell me, then, exactly what evidence there is that the Board of Trustees, when it passed local law number one of 2001 and local law number five of 2004, before Tartikoff came to town, basically, in a colloquial sense, was motivated by animus toward Orthodox Jewish communities. Well, local law one of 2001 was early days. But when the consultants were looking- Not at all, Your Honor. The consultants, when they were drafting their laws, specifically referred to YSV. They had laws that regulated schools, very common laws. But they realized that if they kept their laws, which were typical and common in the area, that some school could come in to a particular piece of property, such as the property at issue and- For example, there was, correct me if I'm wrong, prior to local law number one of 2001, no regulation whatsoever of density, of development, no minimum lot size requirements, all of which are garden variety zoning provisions everywhere, right? I believe that there were dimensional restrictions on the ability to- Setbacks. Correct, correct. Which is rather different, isn't it? Well, those are the same laws, Your Honor, that still apply to libraries and museums in the village. And this is actually the basis for our RLUIPA equal terms argument, that they have treated one assembly and institutional use differently and worse than these other assembly and institutional uses. The district court ruled against this on, this is part of our cross- Zoning changes that were made in 2001 didn't preclude the yeshiva. The yeshiva still could accomplish what it wanted to do, could it not? They did. Under the zoning laws amended under 2001? The yeshiva, there was actually no application for the yeshiva. There was an application for housing, but nothing else. The- I thought your opponent said that they had applied. They had applied for housing. They were in the process of putting together an application. What they, the village was- Planning board, and they laid out what they wanted to do, and there was a lengthy discussion, pros and cons. And there was, as I read it, not a shred of anything that betrayed any hostility, any animus at all with respect to that. Well, that's- Isn't that true? No, it's not true, Your Honor. The village kept asking them if they were going to have dormitories. Why would they ask them if they would have dormitories? Why would they specifically- Could you tell me where in the record I would find that? Why don't your colleagues- I'll get that for you. And then you'll give it to us when you're up for rebuttal. Absolutely. What is, there certainly is evidence that the village was concerned about YSV, but on the face of it, they do appear to be legitimate concerns about zoning concerns. What evidence is there that there was a religious animus here, with respect to the first two laws? The first, well, with respect to the, I think we've talked about Local Law 1 of 2001. With respect to Local Law 5 of 2004, also with respect to the first law, you have Trustee Sanderson saying that Yeshiva Spring Valley was advised to go to a friendlier place, such as the town of Brownfield. That's just a plain misstatement of the record. That was a statement that was made after all of this was history, the two first local laws, and it was in a discussion of why it is they had sold the property. And so the man speculated maybe they decided to go to someplace that was friendlier. Well, I believe that, again- Isn't that exactly right? In the context of all of the evidence, the idea that Ramapo is friendlier means that's where Hasidic Jews belong, in Ramapo, not in our village, not in Pomona. In the context of all of what evidence? The rest of the evidence, the village suing the town of Ramapo, deciding to sue the town of Ramapo prior to adopting Local Law 5 of 2004, specifically discussing the Hasidic population moving into the town of Ramapo, and being accommodated by those specific laws. Why was the village concerned with what the town was going to allow in terms of accommodating a religious minority that was growing within its jurisdiction? And what was the development in Ramapo that was at issue? It was exactly the same development that the village prohibited in Pomona. The idea of adult student housing, the idea that there could be educational institutions that would allow students and their families to reside there in order to be able to study because of the particular needs of this- Can a village preclude adult student housing for any kind of educational institution? Not if it does so with discriminatory intent. I happen to live in a college community in upstate New York, but there are other communities around that I don't think probably would like dormitories in their community. The prohibition on dormitories alone doesn't have a religious implication because there are both sectarian and non-sectarian schools, are there not? Well, again, if this was done in a vacuum with no other evidence- I understand that, I understand that, but you were talking about dormitories, and so this dormitory is in the context of something, right? In the context of the population. But the yeshiva didn't have a dormitory. Could the yeshiva, after the passage of the 2001 law, have accomplished, gotten a special use permit, and been able to build in accordance with the ordinance as amended under 2001? Could the yeshiva have done that? Yes. Then how is that statute discriminatory as to the yeshiva? Because it was not discriminatory specifically towards the yeshiva, but towards the orthodox Hasidic Jewish community. Wait a second, no, wait a second. Not discriminatory as to the yeshiva, but discriminatory as to something else that doesn't exist? Especially as to the idea of dormitories, the idea of- Wait, that wasn't on the tape, the yeshiva wasn't intending to build a dormitory, the village harbors a discriminatory animus as to something that's not proposed? That the village- That doesn't sound like, I don't understand the logic of the connection. I believe that the record shows that the village was asking the yeshiva about the dormitories, the idea of dormitories was an issue- Yeshiva said, no, we don't intend to do so. Then the village went ahead, and the law of 2001 is, well, whether the law was passed before or after, but in any event, the yeshiva could have built and gotten a special use permit to build and exist within the village. Is that correct? It's correct. The laws, again, also regarded private schools as opposed to all schools, including public schools. You know a lot of public schools that have dormitories in K through 12? No, but again, as discussed, the local law one of 2001 had specific regulations, including the 10%, 20% limitation on it that really is the subject here. Let me ask you the question that bothered me from the minute I read this record. Does anyone seriously doubt that the odds would have been 99% that if a group of people proposed to build a college, a residential college of exactly the same kind for yoga instructors that would house 4,000 people in a village of 3,000, that the outcome would have been exactly the same and you wouldn't have a leg to stand on if you were representing the developer? Well, if the outcome being exactly the same would be to ban colleges that would have that number of people, that would be one thing. But that's not what the village did here. The village- That is what the law says. Which law are we talking about, Your Honor? The ones, the latter ones that you're complaining about. The local law one of 2007? What my hypothetical is intended to get at is the very simple proposition that by its very nature, this proposal, whether made on behalf of a secular institution, a public institution, a private institution, a Jewish institution, or a Buddhist institution, raised things that would have been highly objectionable to many inhabitants of the town and many political leaders of the town on its planning merits. My time is up, may I answer? You can answer. The village passed laws that specifically prevent this college, a typical college, Wake Forest, could locate there. Another secular college that has normal dormitories that would bring thousands of students in would be allowed to live there. What they prohibited was a specific form of housing that the village knew was meant to accommodate Orthodox Hasidic Jews, that religious minority. And that's why that's what they prohibited. And that's the minority that they, in 2001 and 2004, altered their zoning to accommodate the Yeshiva proposal, which was different. Granted, it was different in planning constraints, not in the identity of the group that wished to come in. Right? I believe, again, given the village's hostility towards all sorts of Orthodox Hasidic development within its borders and outside of its borders, while not also being opposed to non-Orthodox Hasidic Jewish development, again, within its borders, including in office buildings, parking lot, other forms, other developments outside of its borders, the statements of the village's trustees, the reference to homogenous individuals, the reference to changing up the makeup of the village, talking about religious and cultural diversity, again, viewing all of these facts as a whole. Stepping back and looking at the entire record here, I don't think that it can be said that there's a very plausible interpretation of all of these facts. But I think you've really touched on what, it's your view that the dormitory style, the necessity of living as a family within the context of the school, because of the long hours and the demands upon the course of study, are, in essence, tied to the religious practice. Is that it? Absolutely. I mean, is that your linchpin, that it's the dormitory aspect that really becomes, I mean, just the fact that people want to live in a dorm, or people want to be able to cook in a dorm, that doesn't have a religious connotation. But in the connotation of the study, the type of study for which this school sought to pursue, that was an aspect of their expression of their religious belief. Is that it? Absolutely, Your Honor. That the entire concept, this idea of the Torah community, the idea that they would live, learn, exist together with their teachers, with their families, and so on, free from the interference of the outside world, this is a sincerely held belief of the plaintiffs here. Let me ask you a question. To what degree was there ever any proof before the district court that this was a real thing, this could happen? I mean, there was never an application made. Was there any proof before? There's no similar type of university or school any place in the world, except perhaps in Jerusalem or in Israel. Can someone just walk in and say, I'm going to build a college, and it's going to be like this, and it has to be like this, and suddenly have a claim? Is that it? Again, I believe so, Your Honor. The plaintiffs— So I could go to another community and say, I'm going to found the University of the Jesus Christ Almighty, and there will be 5,000 people studying there. I mean, I don't really have any real plans about it or the necessary financing. There doesn't have to be some kind of concreteness to it, like an application actually made to the village that the village would then deny, around which the discriminatory animus could really crystallize. Two points, Your Honor. First is the corporation's principles testified at length about their desire to do this, their sincerity, their credibility. I understand their desire to do it, but they never filed an application. Well, and that gets to the second point. I mean, they bought the land, I understand. They showed the financial wherewithal to buy the land, but their standing arises without ever having been denied the opportunity to build. Is it because the zoning ordinance so completely shuts them out that it's impossible for them to do so? And that's the fundamental aspect of that part of our cross-appeal, Your Honor. There was nothing to apply for. Congregational Rabbinical College of Tartikoff had no means by which the village could interpret its laws to permit this use. Is that really right? Let's start with the accreditation law that you complain about. You could have petitioned the board to alter that. You could have argued to them that it's not a rational limitation. Did you do it? If the question, Your Honor, is did we petition the same legislative body to change the laws that they passed to prevent this use? No, but that's not an application. That's not under Williamson County. That's not an interpretation of the regulations. That's changing the regulations. I know exactly what it is. I sat on a town board for a lot of years. But it's done all the time to make way for developments, is it not? All the time. Are laws changed to make ways for developments? I believe that is correct, Your Honor. Absolutely. And with respect to the wetlands, what's the evidence in the record that there was no way to gain access to this property because of the wetlands ordinance? The wetlands ordinance prohibited development within 100 feet of the wetlands, which covers the western side of the property. There's no location in which a driveway could be put in. There's an existing driveway on the western side, right? There is an existing driveway that is not sufficient for this use. And what evidence of that is there? I believe that the testimony of Barbara Beal established that. And it was not suitable why? If you develop a site plan for this kind of a use, you have to meet certain criteria. What are the criteria that she said it didn't meet? That it would be within 100 feet. So that's entirely circular. So let's now move on. The property abuts Route 206 in the north. 306, Your Honor. No, 306 is to the west. It's 202 in the north. Forgive me. It abuts 202. The evidence from Barbara Beal and from the village's attorney, Doris Ullman, discussed steep slopes. Based on that evidence, the district court judge determined that it would not be feasible to access 202 from that. And what Barbara Beal said was that in order to get to Route 202, there would have to be, quote, significant, close quote, grading. That's the sum and substance of the evidence, right? Barbara Beal's testimony. Yeah. Was there anything else? I believe that there was a testimony acknowledging the existence of steep slopes from Doris Ullman as well. Well, sure. Now, have you ever driven the Taconic State Parkway? I believe so, Your Honor. Some steep slopes there, right? All over it. Yes. They built a four-lane highway through it. There is not a shred of evidence about how much regrading, what it would cost, whether it was feasible as an economic matter, whether it was feasible as an engineering matter. Isn't that all true? Your Honor, that is a view of the evidence that I believe may be plausible, but so is Judge Karras dismissed the possibility of access to 202 on the ground that it would take significant regrading. All the word significant is is an adjective, and it's a quotation from Barbara Beal, and I'm asking whether there was any evidence whatsoever that would have permitted a conclusion that it was significant in a sense that in fact made it economically or technically impossible. Why don't you answer that, and then we'll move on. I believe that we've discussed the evidence, all the evidence that there was to support that conclusion. I agree with you. I think you have. All right. Thank you. We'll hear from you. Thank you. I'm turning first to Judge Kaplan's point concerning the regrading. On page A-797, where the court talks about that requirement and why Judge Karras found the wetlands to be a block, subsequently on the same page he points out that the parties stipulated as a fact that the property could be developed and subdivided. Therefore, there had to be access to the property. As to the question concerning the site plan and subdivision by YSV, in fact, YSV did submit both a request to subdivide the property to build a certain number of houses and a site plan for their school. Is there a record reference for that? There is, Your Honor. Why don't you give it to us in a letter if the senator says that's okay? Yes, that's fine. Sure. Certainly. And two other points. The reference concerning the fact that only private schools are limited in this zoning, by law in the state of New York, and we've cited to the case law in our brief, local zoning does not control public schools. Public schools are exempt from local zoning. Finally, as to the issue of the dormitory as a religious belief, the position we've pointed out is that the testimony of the actual witnesses, the rabbis who are students, the proposed dean who is a longtime rabbi in the acidic church, and the representative of Tartikoff itself, all gave testimony that they did not have a religious belief that they had to live with their families on the campus. That, in fact, they could live off the campus and walk to the schools. But wasn't there evidence the other way also on that point? Actually, on that point, Your Honor, no. There was not evidence from the parties, from the witnesses, saying that they had to live on the campus. There was evidence about a Torah community, but there was nothing that excluded them from living in the 14 houses or from subdividing the property, because they're only going to use 30 acres for the school, subdividing the property and building houses for another 70 people, that they could live next to the campus and walk to the campus. That would have been completely consistent with their statement of what their religious beliefs was. This case is... That gets back to what Judge Wesley raised earlier, and that is, is anybody obliged? I'm asking it the wrong way. The way in which this lawsuit developed resulted in a decision, did it not, on a hypothetical. The hypothetical presupposes that the aspiration to an institution with 4,000 people on the campus would actually happen, and nobody has any idea whether that's really true, zoning or no zoning. Isn't that right? That's correct, Your Honor, which is why the village has consistently... And remember, there's letters in the record at the time that Tartikoff raised this, before the lawsuit, saying that they couldn't get a variance. And it was suggested that they apply at that point for a zone change or a text amendment, that the village was ready to receive and see their plan. No plan was ever proposed, and as a result, as you say, Your Honor, this whole case was built on a hypothetical that the court simply doesn't know what's going to be built. Let me ask you this. As to the status of the zoning ordinance prior to the later two enactments, the wetlands and the other matter, when the yeshiva was being considered, as the zoning ordinance is constructed at that time, could the college have received a use variance from the board or gotten a special permit to build the college as anticipated? It's stipulated in the record that they could not receive a use variance. Because of the accreditation, right? Because of the accreditation. However, Your Honor, they could have applied for a zone change or for a text amendment. This court... Except that in the context of, at least from a taking standpoint, if they'd owned it, they don't have to seek a legislative change. The relief has to be on the face of the ordinance, right? Actually, Your Honor, this court in B.T. Holdings, in a similar situation, held that a case was not ripe where the party could have petitioned the village board for a zone change. And the property in B.T. Holdings, in fact, wasn't a change from zone A to zone B. It was an unzoned piece of property. And this court held, nonetheless, they were required to at And as Judge Kaplan has pointed out, there's indications in the record that an application, even for a text amendment concerning the accreditation law, would have been favorably, or at least neutrally, received by the village because there was no indication in the record that the accreditation law written in 2001 ever contemplated this kind of situation. It was to keep fly-by-night schools out. We're going back over old ground. Thank you. We'll hear from the other side. Thank you. Your Honor, with respect to the record citation where there was evidence of asking Yeshiva Spring Valley about dormitories, I'd refer the court to TE588 and- Give me that again. TE588 and TE594. Thank you. I would like to point out an alternate grounds for affirmance here, which is under the New York Freedom of Worship provision. The village failed to argue any appeal of that holding of the court. The analysis is completely different. Its entire analysis with respect to the federal RLUIPA and free exercise claim is that the plaintiffs failed to demonstrate a substantial burden on its religious exercise, a level of scrutiny which is not required under the New York Freedom of Worship provision, which simply says you balance the burden on religion with the governmental interests at stake. The village didn't argue anything with respect to their interests. Your Honor, my time is up. Thank you. Well-reserved decision. Thank you, Your Honor.